**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 22-CR-99 (RJL)** |
| **v.** | : | |
| | : | |
| **JAKE MAXWELL,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO TRANSFER VENUE**

Defendant Jake Maxwell, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to transfer venue in this case to the Middle District of Georgia. Maxwell fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion.

**BACKGROUND**

On January 6, 2021, Maxwell, who traveled from Georgia to Washington, D.C. to participate in the rally in support of then-President Trump, was a part of the mob that stormed the U.S. Capitol building and the surrounding grounds in an effort to stop the certification of the Electoral College votes. After entering the grounds of the U.S. Capitol, Maxwell was stopped by a line of metal barricades supported by U.S. Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers in the lower Western Plaza of the U.S. Capitol. Just before 2:30 p.m., Maxwell was part of the group that broke through the police line on the West Plaza. During and as part of that breach, he assaulted two officers. He first banged on and pushed the riot shield of a USCP officer, and later moved forward to MPD Ofc. L. H., first hooking his arm around Ofc. L. H.'s baton, and then grabbing and pulling on it after Ofc. L. H. fended off his first attack. During the assaults, Maxwell's father is seen on video trying to pull him back and restrain him. Maxwell and the other two men he was

1

with then made their way to the Lower West Terrace Tunnel after walking up the stairs, and under the scaffolding, from the Upper West Plaza after breaching the police line between the Lower West Plaza and Upper West Plaza, which is where Maxwell committed the assaults. At the time Maxwell was located just outside the Lower West Terrace Tunnel, other rioters were beating on officers' shields with baseball bats and crutches.

  As an initial matter, it is worth noting that Defendant's Motion to Change Venue, (ECF No. 48) (hereinafter, "Def. Mtn") misstates the timeline of events with regard to the dates that Maxwell was initially charged by criminal complaint and subsequently indicted.  Maxwell was interviewed by the FBI, during a purely voluntary meeting, on December 9, 2021.  Two months later, on February 9, 2021, a criminal complaint and arrest warrant were issued against Maxwell. He was arrested the following day in Athens, Georgia.  On March 25, 2022,[1] a grand jury sitting in this district returned a seven-count indictment charging the defendant with: Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting, or Impeding Federal Law Enforcement Officers, in violation of 18 U.S.C. § 111(a)(1); Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(2); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(4); and Acts of Physical Violence in a Capitol Grounds or Buildings, in violation of 40 U.S.C. 5104(e)(2)(F). (ECF No. 24.)

  Maxwell now moves for a change of venue to the district of his residence, the Middle District of Georgia. ( ECF No. 48) ("Def. Mtn.").  Although he presents no evidence supporting his theory,

---

[1] The Def. Mtn correctly states that the grand jury was sworn in on November 10, 2021, but grand juries often serve for a number of months.  The instant indictment was presented to the grand jury on March 25, 2022.  Later that same day, the grand jury returned true bill in this matter. (ECF No. 24)

2

Maxwell contends that prejudice should be presumed in this district "because of circumstances unique to this case." However, Maxwell never actually specifies any unique circumstances. Instead, Maxwell alleges that there has been a "widespread and inaccurate portrayal of [Mr. Maxwell] in the media," that he is "the victim of D.C.-based systemic race-baiting," and that he has been subject to "false claims" alleging that he is a "white supremacist." None of these claims are substantiated by the Def. Mtn.. No articles specifically related to Maxwell's actions are cited, and the only time during this litigation where Maxwell is alleged to be a member of, or associated with, the white supremacist movement is in his own Def. Mtn. The government has never made that allegation. Maxwell also alleges that a fair and impartial jury cannot be seated due to: (1) the physical proximity of D.C. residents to the U.S. Capitol where the events occurred; (2) the pretrial publicity surrounding the events of January 6; and (3) the Court's voir dire process is not sufficient to screen jurors and jury selection could take weeks to complete. Each of the defendant's arguments is without merit, and the motion should be denied.[2]

---

[2] Every judge on this Court to have ruled on a motion for change of venue in a January 6 prosecution has denied the motion. See, e.g., *United States v. Gillespie*, No. 22-cr-60, ECF No. 41 (D.D.C. Nov. 29, 2022) (BAH); *United States v. Bender*, et al., No. 21-cr-508, ECF No. 78 (D.D.C. Nov. 22, 2022) (BAH); *United States v. Sandoval*, No. 21-cr-195, ECF No. 88 (Nov. 18, 2022) (TFH); *United States v. Nordean*, et al., No. 21-cr-175, ECF No. 531 (Nov. 9, 2022) (TJK*); United States v. Eicher*, No. 22-cr-38, ECF No. 34 (D.D.C. Oct. 20, 2022); *United States v. Nassif*, No. 21-cr-421, ECF No. 42 (D.D.C. Sep. 12, 2022) (JDB); *United States v. Brock*, No. 21-cr-140, ECF No. 58 (D.D.C. Aug. 31, 2022) (JDB); *United States v. Jensen*, No. 21-cr-6 (Aug. 26, 2022) (Minute Entry) (TJK); *United States v. Williams*, No. 21-cr-618, ECF No. 63 (D.D.C. Aug. 12, 2022) (ABJ); *United States v. Herrera*, No. 21-cr-619, ECF No. 54 (D.D.C. August 4, 2022) (BAH); *United States v. Garcia*, No. 21-cr-129, ECF No. 83 (D.D.C. July 22, 2022) (ABJ); *United States v. Rusyn*, et al., No. 21-cr-303 (July 21, 2022) (Minute Entry) (ABJ); *United States v. Bledsoe*, No. 21-cr-204 (July 15, 2022) (Minute Order) (BAH); *United States v. Calhoun*, No. 21-cr-116 (July 11, 2022) (Minute Order) (DLF); *United States v. Rhodes*, et al., No. 22-cr-15, ECF No. 176 (D.D.C. June 28, 2022) (APM); *United States v. Williams*, No. 21-cr-377 (June 10, 2022) (Minute Entry) (BAH); *United States v. McHugh*, No. 21-cr-453 (May 4, 2022) (Minute Entry) (JDB); *United States v. Hale-Cusanelli*, No. 21-cr-37 (Apr. 29, 2022) (Minute Entry) (TNM); *United States v. Webster*, No. 21-cr-208, ECF No. 78 (D.D.C. Apr. 18, 2022) (APM); *United States v. Alford*, 21-cr-263, ECF No. 46 (D.D.C. Apr. 18, 2022) (TSC); *United States v. Brooks*, No. 21-cr-503, ECF No. 31 (D.D.C. Jan. 24, 2022) (RCL); *United States v. Bochene*, No. 21-cr-418-RDM, 2022 WL 123893 (D.D.C. Jan. 12, 2022) (RDM); *United States v. Fitzsimons*, No. 21-cr-158 (D.D.C. Dec. 14, 2021) (Minute Order) (RC); *United States v. Reffitt*, No. 21-cr-32 (D.D.C. Oct. 15, 2021) (Minute Order) (DLF); *United States v. Caldwell*, 21-cr-28, ECF No. 415 (D.D.C. Sept. 14, 2021) (APM); *United States v. St Cyr*, 22-cr-185, ECF No. 63 (D.D.C. February 22, 2023)(JDB).

## ARGUMENT

### I.    Legal Principles

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2, cl. 3.  The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed."  U.S. Const. amend. VI.  These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958).  Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial."  *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors."  *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted).  Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity."  *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc).  "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire."  *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam).  As a result, it is the "well established procedure" in this circuit to "refus[e] [defendants'] pre-*voir dire* requests for ... a change of venue." *Id.* at 64; *see also United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) ("[T]he key to determining the appropriateness of a change of venue is a searching voir dire of the members of the jury pool."); *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991) ("Only where *voir dire* reveals that an

impartial jury cannot be impaneled would a change of venue be justified.").  After voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

This is in part because exposure to media coverage about a case does not indicate that a juror is unqualified to serve.  As the Supreme Court long ago noted, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155–56 (1878).  More recently, the Court reiterated, "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381.  A juror need not be sheltered from all pre-trial exposure to a given case; he or she only must be capable of setting aside any prejudgment and basing a decision based solely on the evidence.  The "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961).  "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*  In fact, the Supreme Court has found no presumption of prejudice even when nearly all the prospective jurors had heard of the case and 77% indicated in voir dire that "they would carry an opinion into the jury box." *Patton v. Yount*, 467 U.S. 1025, 1029 (1984).

Nor does an event's impact on the community necessitate a transfer of venue, even where a large number of residents directly experienced effects of the charged crime.  Courts routinely conclude that a defendant can receive a fair trial in the location where the crime was committed, even where many members of the community were victimized or deeply affected by the events. *See*, *e.g.*, *In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (Boston Marathon bombing);

*Yousef*, 327 F.3d at 155 (1993 World Trade Center bombing); *see also United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. *See Rideau v. Louisiana*, 373 U.S. 723 (1963).  In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting).  The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726.  Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

*Rideau*'s holding was not based simply on the existence of significant pretrial publicity but on the unfairly prejudicial nature of the "dramatically staged" confession by the defendant himself, disseminated to a huge proportion of the jury pool very shortly before trial. *See Skilling*, 561 U.S. at 382 (describing *Rideau*).  Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard*, 384 U.S. 333 (same).

Establishing prejudice is, therefore, a high burden, and it is a burden the defendant carries. The defense must do more than speculate about the possible biases and prejudices of a population that is as large and diverse as a major metropolitan city. *See Bochene*, 2022 WL 123893, at *2 (rejecting January 6 defendant's assertion of prejudice in the D.C. jury pool as based on "conjecture" rather than actual evidence of bias against this particular defendant). Demonstrable prejudice is difficult to come by at this stage, before voir dire, because the jury pool itself has not been identified or questioned.

In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Haldeman*, 559 F.2d at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43.

Finally, a change of venue should only be considered where it might actually serve the purpose of the Sixth Amendment to ensure an unbiased jury. Where a defendant seeks to change venue due to pretrial publicity, he must show that the desired venue does not suffer from the same infection of publicity. A change of venue is of "doubtful value" where media coverage the defendant seeks to avoid is national in reach. *Haldeman*, 559 F.2d at 64 n.43 (noting that the Watergate scandal "is simply not a local crime of peculiar interest to the residents of the District

of Columbia."); *see also Bochene*, 2022 WL 123893, at *3 (noting that publicity of the events of January 6 has been widespread, reaching the people of the defendant's desired district "just as much" as the people in D.C., and the influence of media coverage "would be present 'wherever trial is held'") (quoting *Tsarnaev*, 780 F.3d at 22); *Caldwell*, D.D.C. Case No. 21-cr-28-APM, ECF No. 415, at 11 (noting that January 6 defendant's claim of news media saturation cited to national media outlets and said nothing about the D.C. jury pool).

## II.     Maxwell Has Not and Cannot Establish Prejudice

### A. January 6's Proximity to Washington D.C. Jurors Does Not Support a Presumption of Prejudice in this Case

The defendant contends that a D.C. jury could not be impartial because D.C. residents live geographically close to the U.S. Capitol and were impacted and inconvenienced by the events of January 6. (ECF No. 48 at 4-5). This fact does not explain anything about the jury pool's inherent bias, nor does it provide any basis to conclude that D.C. residents could therefore not formulate evidence-based conclusions about one individual's participation in the January 6 riot. Maxwell has not offered any explanation as to why proximity to the Capitol translates into an unconstitutionally biased jury pool. Indeed, D.C. residents live in close geographic proximity to every crime that occurs within the district's boundaries, and by this logic could not be empaneled as unbiased jurors in any high-profile case involving acts committed in Washington, D.C. That is certainly not required by the Sixth Amendment.

To be sure, some D.C. residents were directly impacted by the events of January 6, either because they adhered to the mayor's curfew order that evening, were diverted due to road closures or other physical impediments, or, perhaps, because they or their associates work in or around the Capitol building. Some of those residents may be selected for jury service and could appear in the venire in this case. During voir dire, the Court and the parties will have the opportunity to explore what impact these events had on those individuals, and whether, and to what extent, it colors their

view of the charges against this defendant.  *See Skilling*, 561 U.S. at 384 (finding that voir dire is "well suited to th[e] task" of identifying and inspecting prospective jurors' connections to the case and impact from the events).  But to prospectively conclude that these potential jurors are biased— and that their numbers will be overwhelming among the jury venire—is pure conjecture.  There is no reason to believe that the district's entire population of 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.  Maxwell offers no evidence to support this claim, nor does he cite any law to support his argument.  If a jury can be empaneled in Manhattan, after the attack on the World Trade Center, or in Boston, after the bombing of the Boston Marathon, certainly one can be empaneled here.

**B.  Media Coverage of January 6 Does Not Support a Presumption of Prejudice in this Case**

The entire nation experienced the events of January 6 together, as those events unfolded, while images were broadcast in real time on television screens across the country.  Maxwell argues that, "District-based media outlets run daily stories falsely claiming that those arrested in connection with the events of January 6th were "white supremacists" or "white nationalists," but he fails to cite a single article, let alone an article related to Maxwell. (ECF No. 48 at 6).  Further, the media coverage of the events of January 6, 2021 has been undeniably national in scope. Even Maxwell notes,  " More than two years later, the events of January 6, 2021 are still regularly discussed on national news platforms. Hundreds of articles are still released daily." (ECF No. 48 at 5).

Jurors in the Middle District of Georgia, who get much of their news from media outlets in Atlanta, have been exposed to much of the same media coverage of the January 6 riot as jurors in any corner of the United States, including in D.C.  Maxwell cites to no articles or D.C.-based media outlets that have discussed his client in particular, but instead makes incendiary claims that, "[t]he prevailing left's systemic race-baiting fanned by the media is un-American, disgusting, vile, and

9

vitiates Mr. Maxwell's ability to receive a fair trial in the District. Unfortunately, systemic race-baiting is standard operating procedure among many D.C.-based media and politicians. The constant false claim that Mr. Maxwell must be either a white supremacist or associated with white supremacists is seared into the minds of potential District jurors, creating a predisposition toward negative impressions of all politically right-of-center Americans. To obtain an impartial jury, Maxwell must be tried outside of the District, in a location where the media has not branded him a racist."  Def. Mtn. at 7.  While such allegations are certainly inflammatory and grab ones attention, they are not based in fact or supported with any evidence or a single citation.  Like the Watergate scandal, the storming of the Capitol on January 6, 2021, was "not a local crime of peculiar interest to the residents of the District of Columbia" but one that is equally important to people all across the country. *Haldeman*, 559 F.2d at 64 n.43.  Maxwell does not argue—nor could he—that the impact of the media coverage of these events is limited to the district where he is charged and will stand trial.

In fact, there is good reason to suspect the opposite.  National coverage of the riots has focused on the mob, the crowds, and the most memorable individuals like those wearing costumes and battle regalia or putting their feet on the desks of prominent lawmakers.  Maxwell has received some media attention, but not nearly as much as many of the more infamous defendants who have been charged.  The people of D.C., like the rest of the country, have been exposed to an array of media images focusing on dozens, hundreds, or even thousands of rioters and protestors who contributed to the events as they unfolded.  News of Maxwell's role in the riot is diffused by the many other people who have received equal or greater attention on the national stage.  Maxwell has not even claimed that the pool of potential jurors in D.C. is likely to have learned his name, recognize his face, or have any information about his specific case as distinguished from any of the hundreds of other January 6 rioters.

On the other hand, media in Maxwell's home district have focused on his case. For example, an online Google search for "Jake Maxwell Athens Georgia" results in links first to *11 Alive,* an NBC-affiliated Altana television station, second to the DOJ website's press release, third to *The Atlanta Constitution*, fourth to a website called "Online Athens," fifth is Fox 5 Atlanta, sixth is a website entitled "Insurrection Index," and seventh is WSBTV, an ABC-affiliate based in Atlanta. It is worth noting that nowhere in the top 20 listings is a Washington D.C.-based media source. Further, most of the articles that appear in the search are dated the date of Maxwell's arrest, February 10, 2022, indicating he has received little to no recent additional large-scale media coverage, at least none that be gleaned from a basic internet search. But even in Georgia, the coverage of Maxwell is certainly less significant than of the defendant in *Skilling*, where the Houston Chronicle "mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy" with "[h]undreds of these articles discussing Skilling by name." *Skilling*, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part).

Moreover, the coverage of January 6 in general, and of Maxwell in particular, is not unfairly prejudicial or inflammatory, and Maxwell has presented no basis to conclude that the jury pool in D.C. is biased as a result of seeing it. Any images showing Maxwell would be relevant and admissible at trial, and they are a far cry from the prejudicial impact of a widely-broadcast, "dramatically staged" extrajudicial confession such as occurred in *Rideau*. *Skilling*, 561 U.S. at 382 (describing *Rideau*). Even "pervasive, adverse publicity [] does not inevitably lead to an unfair trial[,]" where the news stories are not "particularly likely to produce prejudice[.]" *Id.* at 384 (quoting *Nebraska Press Assn. v. Stuart*, 427 U.S. 539 (1976)). As in *Caldwell*, Maxwell "has not put forth a scrap of evidence to support his claims of jury bias," and his attempt to equate media coverage with actual bias are "based entirely on his own speculation." *Caldwell*, D.D.C. Case No.

21-cr-28-APM, ECF No. 415, at 11.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on Maxwell's conjecture. As in *Haldeman*, there is "no reason for concluding that the population of Washington, D.C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. 559 F.2d at 62. Even a great deal of pretrial publicity does not disqualify a potential juror or an entire venire. As *Skilling* noted, "juror *impartiality* . . . does not require *ignorance*." 561 U.S. at 381; *see also Patton*, 467 U.S. at 1029 (finding no presumption of prejudice even when 77% indicated on voir dire that "they would carry an opinion into the jury box").

### C.   The Size of the Jury Pool Does Not Support a Presumption of Prejudice in this Case

Maxwell's final argument is that by the time of his trial in September 2022, the pool of eligible jurors will be that much smaller, as other January 6 defendants take their cases to trial before his. Def. Mtn. at 9. He cannot show an impact on the jury pool sufficient to justify a change of venue.

To date, there have been 27 jury trials involving 34 defendants in connection with the Capitol Riot investigation. As of today's date, there are four ongoing jury trials involving January 6 defendants. This includes several high-profile cases involving well-known leaders of national movements such as the Oath Keepers and the Proud Boys, have been tried before a jury.[3] In each

---

[3] The prompt and unanimous guilty verdicts in other January 6 jury trials resulted from the strength of the government's evidence. Moreover, juries in three recent January 6 trials have either been unable to reach a verdict on certain counts, *see United States v. Williams*, No. 21-cr-618-ABJ (D.D.C.); *United States v. Vincent Gillespie*, No. 22-cr-60-BAH, or have acquitted on some counts, see *United States v. Rhodes, et al.*, No. 22-cr-15, ECF No. 410 (D.D.C. Nov. 29, 2022). This indicates that D.C. jurors are carefully weighing the evidence and not reflexively convicting January 6 defendants on all charges, and that the jury selection in those cases indicates that impartial juries can be selected in this district.

case, the Court has easily been able to seat juries from diverse backgrounds in a timely manner. In a district of approximately 700,000 residents, that leaves hundreds of thousands of potential jurors. As such, there is no reason to surmise that publicity would mention Jensen's case in particular.Moreover, any additional publicity involving Maxwell himself will likely be offset by the additional passage of time since the events of January 6. *See Skilling*, 561 U.S. at 383 (observing that "the decibel level of media attention diminished somewhat" in the four years between Enron's collapse and trial); *Patton*, 467 U.S. at 1029 (observing that "prejudicial publicity [had] greatly diminished and community sentiment had softened" in four years). If, as Maxwell supposes, the jury pool is irredeemably prejudiced by the time of his trial, the Court's voir dire will reveal the issue and a solution can be tailored at that time. But Maxwell's conjecture that this *might* come to pass in the future is wholly insufficient to support a transfer of venue now.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Elizabeth N. Eriksen*
ELIZABETH N. ERIKSEN
VA Bar No. 72399
Trial Attorney, Criminal Division
U.S. Department of Justice
Detailed to DC USAO
Tel: (202) 616-4385
Email: Elizabeth.Eriksen@usdoj.gov