UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CASE NO. 22-cr-99 (RJL) |
| v. : | |
| : | |
| JAKE MAXWELL, : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE**

Defendant Jake Maxwell, who is charged in connection with events at the U.S. Capitol on January 6, 2021, has moved to suppress statements he made to law enforcement on December 9, 2021. (ECF No. 47). Because his statements were made voluntarily in a non-custodial meeting, the defendant was not entitled to *Miranda* warnings, and this Court should deny the defendant's motion.

**STATEMENT OF FACTS**

On January 6, 2021, Maxwell, having driven from Georgia to participate in the rally in support of then-President Trump, was a part of the mob that stormed the U.S. Capitol building and the surrounding Captiol grounds in an effort to stop the certification of the Electoral College votes.. After entering the grounds of the U.S. Capitol, Maxwell was stopped by a line of metal barricades supported by U.S. Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers in the lower Western Plaza of the U.S. Capitol.  Just before 2:30 p.m., Maxwell was part of the group that broke through the police line on the West Plaza.  During and as part of that breach, he assaulted two officers. He first banged on and pushed the riot shield of a USCP officer, and later moved forward to MPD Ofc. L. H., first hooking his arm around Ofc. L. H.'s baton, and then grabbing

1

and pulling on it after Ofc. L. H. fended off his first attack. During the assaults, Maxwell's father is seen on video trying to pull him back and restrain him. Maxwell and the other two men he was with then made their way to the Lower West Terrace Tunnel after walking up the stairs, and under the scaffolding, from the Upper West Plaza after breaching the police line between the Lower West Plaza and Upper West Plaza, which is where Maxwell committed the assaults. At the time Maxwell was located just outside the Lower West Terrace Tunnel, other rioters were beating on officers' shields with baseball bats and crutches.

On April 1, 2021, the FBI conducted a telephone interview of Maxwell's father, who was with him at the Capitol on January 6, 2021. Maxwell also was on the phone call during the interview. Maxwell's father stated that he, Maxwell, and a third person traveled to Washington, DC, to attend the rally for President Trump that occurred on January 6, 2021. Maxwell's father stated that after the three of them attended the rally on January 6, 2021, they followed the crowd to the U.S. Capitol.

In and around October 2021, the FBI received information from a confidential human source identifying Maxwell as a person who was engaged in physical confrontations with law enforcement officers at the Capitol on January 6, 2021. FBI Atlanta obtained and reviewed copies of body-worn camera ("BWC") footage of two Metropolitan Police Department ("MPD") officers, which was recorded in the West Plaza area of the Capitol grounds on January 6, 2021. Those videos showed Maxwell committing the violations for which he is charged in the Indictment.

On December 9, 2021, Maxwell voluntarily went to FBI Atlanta and engaged in an interview with agents. Agents contacted Maxwell by phone in order to arrange to visit him in

2

Athens, Georgia for an interview, but Maxwell responded that he instead preferred to go to the FBI building in Atlanta and meet there, so the date and time was arranged.

The interview was recorded and lasted a total of 24 minutes. Agent Floyd began by asking basic biographical questions The interview took place in a victim-witness room, usually used for civilian witness and victims of crimes, not a "in a small, cramped room" that was "sufficient to place any individual in reasonable uncertainty as to whether they are free to leave or subject to arrest." (ECF Np. 47 at 3). The room is carpeted and is not used to interview charged defendants as it is not equipped to secure prisoners with handcuffs of the like. During the interview, MAXWELL was advised that the agents wanted to put the investigation "to bed." At no time did anyone advise him he would not be charged. In fact, at around three minutes into the interview, when the defendant said he thought he "was out of it, but then I'm right back in it. You're gonna have to work with me as well…It's a little bit of a touchy subject," it seems that he is aware that the investigation is ongoing and not under the impression it would be wrapping up soon as Maxwell contends (ECF No. 47 at 6). Further, the defendant was confident in his answers, and he advised he has some college training, but he did not finish school despite interest in majoring in criminal justice and business and entrepreneurship. Instead, Maxwell runs a business Called "Interstate Poker Club," a gambling club run out of bars and restaurants, and in fact, they were the #1 poker club in the state of Georgia at the time of the interview.

Despite Maxwell's claim that he "was asked leading questions, that they [agents] knew (and hoped) nonetheless would illicit an incriminating response," the bulk of the interview consisted of open-ended questions, where Maxwell narrated his perspective of events, why he went to Washington D.C. on January 6th, and what he wanted to accomplish. Specifically, from approximately minute 6:25-7:35 of the interview, Maxwell advised that he came to D.C. on

3

January 6th because he had seen prior protests of Antifa and Black Lives Matter in D.C. when he visited D.C. in November 2021. He contrasted what he apparently perceived to be law enforcement's inaction at those events compared to January 6th when he said that at the prior protests "they [police] did nothing … but on January 6th at the Capitol there was tear gas and mace right off the bat." Maxwell advised that "was gonna make some people made by doing that, you know, especially people like us that came and saw." He stated that it was, "completely different and sad, honestly." None of this came from the agents, Maxwell offered this on his own, seemingly as a way to explain his actions taken on January 6th or possibly try and exculpate himself. Throughout the interview, the agents mainly asked open-ended questions about what Maxwell saw and experienced. The "leading" questions to which counsel refers likely took place as Maxwell and the agents watched BWC together and it sounded as if Agent Floyd was narrating what they were seeing on the screen. Maxwell's motion refers to the incident where they are talking about the baton (ECF No. 47 at 7). Following the excerpt Maxwell cites, at approximately 20:32 minutes into the interview, Agent Floyd then says," Obviously, you don't want to pull on the baton of a police officer," and Maxwell replied, "Yeah, you gotta think of the scenario though. It's freaking scary." The other agent said, "on both sides," and Maxwell replied. "One hundred percent." In sum, Maxwell recognized the seriousness of the issue and it is clear from the audio recording of the interview that nobody was putting words in his mouth.

      At all times the interview was cordial. Maxwell presented as bright, alert, lucid, and engaged throughout the entire meeting. All the circumstances surrounding the interview indicate that it was voluntary and that understood this. In no way was Maxwell forced to discuss anything he did not want to, and agents gave him leeway to describe the events of January 6th as he recalled them. At no time was he forced to come to the building, rather, he chose to go there of his own

accord. The interview was over in 24 minutes, at which time the defendant left the FBI building. At the time this interview occurred, agents were still collecting information as a part of the investigation, and, despite what Maxwell erroneously alleges in his motions, he was not indicted at the time of this meeting. In fact, Maxwell was not charged by criminal complaint until February 9, 2022, and not indicted until March 25, 2022. In sum, the meeting was completely voluntary, the defendant was well aware of what was going on, he was not coerced, and *Miranda* was not triggered as the defendant was weeks away from being charged.

Maxwell now moves to suppress his December 9, 2021 statements. He claims the interview was custodial, that it was an interrogation, and that therefore the absence of *Miranda* warnings requires the statements be suppressed. These arguments are without merit. Maxwell's interview was voluntary and non-custodial, and the statements he made are admissible.

## ARGUMENT

Maxwell's voluntary interview with the FBI, which occurred at the time and location of his own choosing, was not custodial, and therefore no *Miranda* warnings were required. Furthermore, Maxwell's statements were the product of a free and unconstrained choice by Maxwell himself, not of any police conduct that even arguably approaches coercion. Maxwell's interview statements are admissible as direct evidence at trial.

I.   **Maxwell's Statements to Law Enforcement Were Non-Custodial and No *Miranda* Warnings Were Required**

   a.   **Legal Principles**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. To safeguard that right, the police must warn a suspect who is going to be questioned while in custody that he "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the

presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). But this prophylactic applies only to custodial interrogation—which the Supreme Court defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. In other words, *Miranda*'s rule does not come into play unless the court determines that the defendant was in "custody" for this purpose.

In this context, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *United States v. Burden*, 934 F.3d 675, 161 (D.C. Cir. 2019) (citing *Howes v. Fields*, 565 U.S. 499, 508 (2012)) (quotation marks omitted). There are two components to the *Miranda* custody analysis. *Howes*, 565 U.S. at 508–09. "[T]he initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 509 (internal citations omitted). "[C]ourts must examine 'all of the circumstances surrounding the interrogation'" to determine if the subject's "freedom of movement was curtailed." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994) (*per curiam*) (finding an officer's intent to restrict the liberty of a suspect is only relevant on the custody issue if it is "conveyed, by word or deed, to the individual being questioned")). Factors relevant to this analysis include: (1) the location of the interview; (2) its duration; (3) statements made during the interview; (4) any use of physical restraints during the interview; and (5) whether the person was released at the end of the interview. *Howes*, 565 U.S. at 509 (collecting cases). If the individual would have felt free to leave, the inquiry ends; a restraint on freedom of movement is a prerequisite for *Miranda* custody. *See Maryland v. Shatzer*, 559 U.S. 98, 112 (2010).

But "[b]ecause not all restraints on freedom of movement amount to custody for purposes of *Miranda*, a finding that a person in the suspect's shoes would not have felt free to leave does not end the inquiry." *United States v. Cooper*, 949 F.3d 744, 748 (D.C. Cir. 2020) (citing *Howes*, 565 U.S. at 509) (quotation marks omitted). The second step is to ask, "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *see also Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) (explaining that "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody"). Coercive pressures include "the shock" of being arrested and questioned after being "yanked from familiar surroundings in the outside world" and "'cut off from his normal life and companions'"; "the hope" that speaking will allow the interviewee "to leave and go home"; and a reason to think that the interrogating officers have "authority to affect the duration" of the interviewee's confinement. *Howes*, 565 U.S. at 511–12 (quoting *Shatzer*, 559 U.S. at 106).

The location of an interview does not determine its custodial nature. "Indeed, *Miranda* did not even establish that police questioning of a suspect at the station house is always custodial." *Howes*, 565 U.S. at 507-08 (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)). In *Mathiason*, the defendant, who was suspected of burglary, was asked to call the police officer investigating the crime. 429 U.S. at 495. The defendant did call, and agreed to come to the state patrol office to "discuss something" with the officer. *Id*. During that meeting, the two sat in an office at the station house where the door was closed. At the end of the interview, the defendant left the police station "without hindrance." *Id*. Although the interview occurred at the police station and the defendant was in fact suspected of the crime that was the subject of the interrogation—indeed he was later charged for that crime—the Supreme Court found that the situation was "noncustodial." *Id*.

7

*Miranda* warnings were thus not required. *Id*. The Court made this conclusion even while acknowledging that some aspects of the interview were "coercive"—noting that all police interviews will have some degree of coercion to them. *Id.*

Other courts have found station-house interviews non-custodial for Miranda purposes, following on *Mathiason*. In *United States v. Patterson*, for example, a suspect was interrogated at the FBI's office after armed agents approached him near his home and brought him to the interview location in an FBI vehicle. 826 F.3d 450, 453 (7th Cir. 2016). During the two-hour interview that followed, the defendant indicated that he believed he would be arrested, and asked the agents when they thought that would happen. *Id.* at 453-54. But he was never restrained while in the interview room, and the door remained unlocked; furthermore, he left after the interrogation. The court found this setting non-custodial for *Miranda* purposes. *Id.* at 459.

Likewise, in *United States v. Galceran*, police left the defendant a business card and asked him to call; when he did, the officer asked him to come to the police station to discuss a series of robberies and told him he would not be arrested. 301 F.3d 927, 929 (8th Cir. 2002). The defendant drove himself to the police station after telling his family "that he was going to turn himself in" with the hope that he would receive leniency from the judge. *Id.* at 930. Although the questioning took place at the police station, the court found that the "setting was not police dominated," in part because the defendant voluntarily appeared for the interview. *Id.* at 931. Moreover, the defendant left at the end of the interview—a factor the court noted was "very important" in its determination. *Id.* (citation omitted). The court found the defendant was not in custody or otherwise deprived of his freedom of action in any significant way, and *Miranda* warnings were not required. *Id.*

### b. A Reasonable Person in Maxwell's Position Would Feel Free to Leave

Maxwell chose to visit the FBI building to speak with investigators. Agents offered to come to him in Athens, but he chose instead to travel to meet with the FBI in Atlanta. He was not summoned there. He offered up information pursuant to open ended questions and provided several, long, narrative answers in response to general questions. He was never restrained or handcuffed. While the topic was serious in nature, the tone of the interview was cordial and in no way hostile or intimidating. He was never told he was under arrest, because he was not and the meeting was voluntary. The entire interview lasted 24 minutes and occurred in a carpeted victim room. In light of the objective circumstances of this interview, any reasonable person in Maxwell's position would have felt free to terminate the interview and leave. *See Howes*, 565 U.S. at 509 (noting the importance of factors including whether the person was released at the end of the interview, the absence of physical restraints, and statements made during the interview).

Maxwell's interview was less akin to a custodial setting than the circumstances in *Patterson* and *Galceran*, both of which were found non-custodial. Maxwell was not summoned to the FBI building—he chose the location and then reported there at the agreed upon time. *Cf. Patterson*, 826 F.3d at 453 (interview was non-custodial even when armed agents checked the defendant for weapons before bringing him to the FBI office in an FBI car); *Galceran*, 301 F.3d at 931 (a defendant's intention to "turn himself in" at the police station does not make an interview there custodial, particularly because the defendant did in fact leave freely at the end of a two-hour interview). Maxwell's interview occurred on his own terms, at the time and place he and the agents selected, without any restraint on his movements. And it ended with him leaving freely, just as he expected.

### c. The Environment of the Questioning Was Not Coercive

Even if the Court disagrees and finds that a reasonable person in Maxwell's position would not have felt free to terminate the interview or leave the FBI building, the analysis is not over; a person is only in *Miranda* custody if *both* prongs of the *Howes* test are met. Here, there was nothing coercive about the meeting. Maxwell walked into the FBI building of his own accord, without any "shock" of being arrested or "yank[ing]" from his familiar surroundings. *See Howes*, 565 U.S. at 511-12. He walked out when the interview was over and was not arrested for two months. He volunteered all the information he provided, and also agreed with the agents' narrative as they all watched the video being described the events being shown. He offered several lengthy narratives, in response to general questions. The overall tone was polite and respectful, nobody raised their voice once during the interview. The setting here was, in sum, nothing like the inherently coercive pressures discussed in *Miranda. Howes*, 565 U.S. at 509. No prophylactic warnings were required to protect Maxwell's rights, because he was not in custody.

## II. Maxwell's Statements to Law Enforcement were Voluntary And It Was Not An Interrogation

Maxwell next claims that his interview was not voluntary by Constitutional standards; that is, that his will was overborne such that he made the statements only because of police coercion. (ECF No. 47 at 8-9). This argument is baseless. Maxwell reported to the FBI building and was open and candid about the events of January 6, 2021. He never showed any inkling of a desire to stop the interview. At times, he seemed to try to explain how the events of January 6th were his Constitutional right and distinguish them with other protests, seemingly trying to explain away his behavior and any culpability for his actions.

For a defendant's statements to be admitted at trial, the government must show that they were made voluntarily. As the D.C. Circuit has summarized, "[v]oluntariness turns on whether the

10

'defendant's will was overborne' when he gave his statement, and the test for this is whether the statement was a 'product of an essentially free and unconstrained choice by its maker.'" *United States v. Murdock*, 667 F.3d 1302, 1307 (D.C. Cir. 2012) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973), and *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  Unlike the determination of *Miranda* custody, this inquiry is subjective, focusing on the defendant's understanding of the proceedings and events. The absence of *Miranda* warnings—even when they were required—does not indicate that a statement was not voluntary. To the contrary, the D.C. Circuit has reversed the suppression of a statement where the defendant initially invoked his right to remain silent and was questioned anyway, in violation of *Miranda*.  *Murdock*, 667 F.3d at 1307.

To determine whether a defendant was coerced such that his will was "'overborne and his capacity for self-determination critically impaired,'" a court must consider "the characteristics of the accused and the details of the interrogation." *Bustamonte,* 412 U.S. at 225-26 (quoting *Culombe,* 367 U.S. at 602). But "a defendant's mental condition, by itself and apart from its relation to official coercion," cannot "dispose of the inquiry into constitutional 'voluntariness.'" *Colorado v. Connelly*, 479 U.S. 157, 164, (1986). Therefore, a law enforcement officer's "nonthreatening behavior" militates "towards a noncoercive encounter," even where a defendant has provided evidence of "low intelligence, poor schooling, history of psychological problems, and the absence of any warning of her right to withhold consent[.]" *United States v. Hall*, 969 F.2d 1102, 1107, 1108 (D.C. Cir. 1992) (evaluating voluntariness in the related context of a Fourth Amendment waiver).

In *United States v. Hallford*, the D.C. Circuit reversed the trial court's assessment that police conduct was coercive. 816 F.3d 850, 858 (D.C. Cir. 2016). There, the defendant—who was diagnosed with "'schizoaffective disorder'…, paranoid delusions, and self-destructive behavior"

—was being involuntarily held at a hospital based on threats he made when he was receiving medical care. *Id.* at 853, 855. Without providing *Miranda* warnings, agents interviewed him at the hospital. *Id.* at 853. The agents asked straightforward questions in conversational tones, and he was deprived of no essentials. Although the defendant had psychiatric problems, nothing the agents did contributed to an atmosphere of coercion, which is necessary to a finding that statements were involuntary. *Id.* at 859. Similarly, in *United States v. Cooper*, the D.C. Circuit found statements were given freely and voluntarily when no weapons were brandished and no handcuffs were used, the defendant was "cooperative," the agents employed a "professional and cordial tone," and at no point did the defendant ask to end the questioning. 949 F.3d 744, 749 (D.C. Cir. 2020).

Maxwell claims that his interview was not voluntary because he was "alone in a closed room at the FBI Headquarters Office in Atlanta, Georgia (an hour and a half away from his home)," (ECF No. 47 at 4). But these reasons are both factually unsupported and legally insufficient. There is no evidence that Maxwell did not understand what was going on or that he was unable to make a free choice to engage in the interview. To the contrary, he chose the location and the timing of the meeting. He chose to come alone and travel far from his home. While Maxwell might not have a criminal history, he has some college training, runs a very successful business, and was a party to a telephone interview his father conducted with the FBI in April 2021, so he knew the nature of such a meeting and what would likely be discussed. Maxwell further contends that "the federal agents dominated the atmosphere in which the interview took place. Such behavior is a substantial factor to consider in determining whether Mr. Maxwell was in custody. Nearly one month prior to this interview, a grand jury sat, was sworn, and returned an indictment against Mr. Maxwell." ECF No. 47 at 5. Not only is it clear when listening to the interview that Maxwell did far more talking than the agents, but again, he was not charged and arrested until February 9, 2022,

two months after this interview occurred. In fact, this interview was part of the ongoing investigation to determine if, when, and what charges might be levied against Maxwell.

None of the reasons Maxwell cites in support of his claim of involuntariness are supported in the evidence, nor do they provide any legal basis for a finding of involuntariness. Accordingly, this claim should be rejected.

### III. The Statement Was Not Obtained In Violation Of Mr. Maxwell's Sixth Amendment Rights

Maxwell asserts that his Sixth Amendment rights were violated because "nearly one month prior to this interview, a grand jury was empaneled, sworn and returned, recommending charges against Maxwell. As alluded to above, although Maxwell was not aware of the empaneling and returning of charges against him, it's very likely Agent Floyd and Agent Urban were aware." As noted above, the timeline of events in this case as recited by the defendant are demonstrably wrong. The defendant was charged by criminal complaint on February 9, 2021. He was arrested pursuant to that complaint on February 10, 2021. He was then indicted by the grand jury on March 25, 2023. The case was presented to the grand jury on March 25, 2023, and a true bill was returned later that day. The grand jury did not hear any evidence in connection with this defendant on the date they were impaneled or on any other date before the date the indictment was returned. The date a grand jury is impaneled and first sworn in has no bearing on the date they return an indictment as the grand jurors often serve for several months at a time. As such, the defendant was not charged on December 9, 2021, and thusS his sixth Amendment right to counsel did not attach.

## CONCLUSION

For the foregoing reasons, the defendant's motion to suppress evidence should be denied.

                        Respectfully submitted,

                        MATTHEW M. GRAVES
                        United States Attorney
                        D.C. Bar No. 481052

By:   /s/ Elizabeth N. Eriksen
        ELIZABETH N. ERIKSEN
        VA Bar No. 72399
        Trial Attorney, Criminal Division
        U.S. Department of Justice
        Detailed to DC USAO
        Tel: (202) 616-4385
        Email: Elizabeth.Eriksen@usdoj.gov